[Cite as *State v. Jamison*, 2014-Ohio-3275.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No. L-12-1274

       Appellee                              Trial Court No. CR0201101607

v.

Ricky Jamison                                    **DECISION AND JUDGMENT**

       Appellant                              Decided:  July 25, 2014

* * * * *`

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Tim A. Dugan, for appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an appeal from a judgment of the Lucas County Court of Common

Pleas, which found appellant guilty of three counts of rape, in violation of R.C.

2907.02(A)(2) and (B), all felonies of the first degree, and one count of kidnapping a

minor under the age of 13 or a mentally incompetent individual, in violation of R.C.

2905.01(A)(4) and (C), also a felony of the first degree. Following jury trial, appellant was convicted on all counts and sentenced to ten-year terms of incarceration for each of the four counts, to be served consecutively. For the reasons set forth below, this court affirms the judgment of the trial court.

{¶ 2} Appellant, Ricky Jamison, sets forth the following four assignments of error:

I. The Trial Court erred by allowing Appellee to use leading questions on direct examination of the victim at trial.

II. The Trial Court erred by allowing duplicative and inflammatory photographs to be admitted as evidence.

III. Appellee failed to provide legally sufficient evidence at trial to sustain a conviction on three counts of rape.

IV. Appellant's convictions fell against the manifest weight of evidence.

{¶ 3} The following undisputed facts are relevant to this appeal. This case arises from the kidnapping and vicious rape over the course of many hours of a girl who was playing outside of her home in a Toledo neighborhood. At approximately 5:00 p.m. on March 3, 2011, the victim's mother arrived home from work. The victim was eager to go outside and play. The victim is significantly developmentally delayed. She was 14 years of age at the time of the incident and possessed the cognitive functioning of a child approximately one-half her chronological age.

2.

**{¶ 4}** On March 3, 2011, the victim asked her mother if she could go outside and walk the neighbor's dog. The victim's mother gave her permission to do so. The victim's mother realized that when her daughter said she wanted to "walk the dog," the victim meant she wanted to retrieve the neighbor's dog, bring it home, and play with the dog in her yard. Due to her circumstances, the victim was not allowed to walk around the block by herself. Notably, the victim required occupational therapy, physical therapy, speech therapy, and special needs classes. She was exempt from the standardized testing required by Ohio schools.

**{¶ 5}** It is illuminating to note that the victim's studies were centered on rudimentary tasks such as speaking in complete sentences, following basic directions, and asking for a sight menu at McDonald's so that she could order for herself.

**{¶ 6}** Although the victim's cognitive limitations prevented her from understanding and participating in the things that other children her same chronological age typically do, she always enjoyed activities such as pushing a stroller with her dolls inside, playing school, and playing dress-up.

**{¶ 7}** At 6:30 p.m., the victim's mother became concerned as her daughter had not returned inside the home. She began to look for her daughter throughout the neighborhood at neighbors' homes and at a senior citizen facility that is in close proximity to the victim's house. The victim enjoyed visiting with the senior citizens at the senior citizen residential facility. After failing to locate her daughter after several hours of frantic searching, her mother called the police.

3.

**{¶ 8}** At approximately 4:30 p.m. the day after the victim disappeared, a Maumee High School student discovered the disheveled and disoriented victim near the Andover Apartment complex located along the border of Maumee and Toledo. The victim had visible marks on her neck. The victim was distraught and stated that "he hurt me," "I told him no, mommy, and he grabbed me by the neck and put me in the car."

**{¶ 9}** Given the victim's condition, she was taken to Toledo Hospital. She was treated by a Sexual Assault Nurse Examiner ("SANE nurse"). The SANE nurse "could tell right away" that the victim was not a typical 14 year old because she was "very childlike in her mannerisms, in her speech, the way she talked." The SANE nurse took the victim's medical history and performed a complete "head to toe assessment." The SANE nurse determined that a sexual assault examination was required.

**{¶ 10}** Accordingly, the SANE nurse took oral swabs, fingernail swabs, vaginal swabs, anal swabs, and combed the victim's pubic hair. Additionally, a blue light, which luminesced on bodily fluids, was utilized. It revealed bodily fluids on the left side of the victim's chin, upper right arm, buttocks, and mons pubis. Thus, all of these areas were also swabbed. Lastly, the SANE nurse collected the victim's clothing, including her underwear, which was inside out and stained with dried blood and drainage.

**{¶ 11}** Significantly, during the examination, the victim voluntarily disclosed to the SANE nurse portions of what had occurred to her after she went missing. The victim stated, "he grabbed my key around my neck" and "he put his boy privates in my mouth."

4.

Additionally, as the SANE nurse assessed the victim's vulva, the victim stated that he "put his boy privates in there."

{¶ 12} The victim further shared with the SANE nurse that she kept crying during her ordeal and told her attacker repeatedly that she wanted to go home. She stated "I kept crying and telling him I wanted to go home; I didn't sleep or eat anything; he wouldn't let me go home; he took my pants off and he pushed me down."

{¶ 13} The physical examination revealed that the victim had lacerations in the area of her hymen, redness and tenderness at the clitoral hood, abrasions to her labia minora, and redness, abrasions and tenderness on the posterior fourchette. Notably, the victim continued to bleed throughout the examination. At trial, the treating SANE nurse authenticated and discussed twelve photographs that were taken of the victim's injuries during her examination.

{¶ 14} In addition to the SANE nurse, treating physician Dr. Schlievert testified for the prosecution as an expert witness in pediatric abuse and neglect. Schlievert testified in relevant part that the victim, "definitely was developmentally delayed," and was, "significantly much younger in her demeanor, behavior, expressions, and language and speech." He noted that the victim required reassurances similar to children who are four or five years old that she would not need shots during the doctor's office visit. Schlievert also testified that the victim stated to him that, "he put his—she didn't want to say it at first but then she said pee pee in her front butt." The victim further disclosed to

5.

Schlievert that "he made me suck it."  Based upon his assessment of what was done to the victim, Schlievert recommended H.I.V. testing.

{¶ 15} In conjunction with testimony from medical providers, the prosecution also called an expert in forensic biology and forensic DNA typing employed by the Ohio Bureau of Criminal Identification and Investigation ("BCI").  The BCI witness testified that the semen that was detected on the vaginal and anal swabs in the rape kit, and amylase (an enzyme present in high concentrations of saliva) was detected on the neck and buttocks swabs.  A comparison of the vaginal and anal swabs to a reference sample from the victim showed the presence of the victim's DNA, as well as an unknown male.  The unknown male's profile was entered into the national database, which triggered the investigation of appellant's role in the kidnapping and rape of the victim.

{¶ 16} Given these developments in the case, DNA was obtained from appellant.  It was submitted to BCI for testing.  Appellant's DNA was a match to the perpetrator's DNA.

{¶ 17} The BCI witness testified in pertinent part, "Based on the national database provided by the Federal Bureau of Investigation, the expected frequency of occurrence of the DNA profile from the sperm fraction of the vaginal swabs * * * is 1 in 121,200,000,000,000,000 unrelated individuals."

{¶ 18} Consistently, the anal swab also resulted in two DNA profiles, one matching the victim and one matching appellant.  The BCI witness testified, "Based on the national database provided by the Federal Bureau of Investigation, the expected

6.

frequency of occurrence of the DNA profile from the sperm fraction of the anal swabs * * * is 1 in 8,203,000,000,000,000,000 unrelated individuals."

{¶ 19} At trial, the victim testified that when she was walking her baby doll in a stroller, a bald stranger got out of a car, grabbed her by the neck, choked her, and forced her into the car.

{¶ 20} A detective with the Toledo Police department testified that the victim was discovered near the Andover Apartment complex, which is in close proximity to appellant's apartment. The detective testified that after appellant was identified by BCI as the source of the semen from the swabs taken from the victim, a search warrant was executed upon appellant's apartment.

{¶ 21} During the search of appellant's apartment, a pillow on the couch that matched one depicted in a photograph found on the victim's mobile phone was recovered. The couch, chairs, table, and thermostat on the wall were in the same exact locations as reflected in the victim's mobile phone photos. All of this further supported the already substantial evidence collected that appellant was the perpetrator of these crimes.

{¶ 22} After the search of appellant's apartment was concluded, appellant was taken into police custody. During the investigative interview of appellant, appellant was shown photographs of the victim and was asked why his DNA would have been recovered from the victim's person. Appellant unconvincingly conveyed that he

sometimes picked up women and had sex with them but might not recall the women afterwards.

{¶ 23} Ultimately, appellant conceded to the investigating officers that he was riding around in his friend's car when they saw the victim walking alone in the area where the victim resided. Appellant stated that they had innocently asked the girl "what's up," and in response, she jumped into their car, he drove her to his apartment, and she said she wanted to make love. Appellant stated that he told her she looked kind of young, but said that she replied that she was 18 years old. Appellant stated that they attempted intercourse, but she was "real tight" and he could not penetrate her. Upon attempting penetration again, she was still "too tight." He volunteered that due to her tightness he "came quick."

{¶ 24} Appellant unconvincingly proclaimed at trial that the prosecution had been "all lies" and had been "fabricated." With respect to the incriminating photos, separate and apart from the multiple DNA matches, appellant hypothesized that the police had somehow staged the photos inside his apartment with the victim on his couch to set him up.

{¶ 25} The jury was not convinced. The trial concluded and the jury found appellant guilty of all counts. This appeal ensued.

{¶ 26} In the first assignment of error, appellant contends that the trial court erred by abusing its discretion in allowing appellee to ask leading questions of the victim on direct examination. We are not persuaded. The record shows that the trial court properly

8.

permitted leading questions on direct examination pursuant to Evid.R. 611(c). The victim is significantly developmentally delayed, which necessitated questions for her to be posed in a more leading fashion than would be necessary for a witness not having her cognitive limitations.

{¶ 27} Evid.R. 611(c) permits the use of leading questions "as may be necessary to develop the witness' testimony." Evid.R. 611(c) is broad and leaves the limits of the use of leading questions on direct examination within the sound discretion of the trial court. *State v. Lewis*, 4 Ohio App.3d 275, 278, 448 N.E.2d 487 (3d Dist.1982).

{¶ 28} The record reflects that multiple medical professionals familiar with the victim and the victim's mother all testified that the victim functioned at a far lower level than fully functioning individuals her same age. Thus, the intellectual capability of the victim properly formed a justification in warranting the disputed leading questions to her on direct examination. *See State v. Jones*, 2d Dist. Montgomery No. 17903, 2000 WL 1006557 (July 21, 2000) (court upheld the use of leading questions when the victim was 14 years old at the time of trial but functioned at the mental level of a 7-year-old child).

{¶ 29} The record reflects that appellant's claim that there was no testimony of anyone qualified to judge the mental capabilities of developmentally delayed children is without merit. On the contrary, two treating medical expert witnesses testified to the victim's delayed developmental state. The content of victim's own testimony corroborated the expert witnesses' assessment of her limitations.

9.

**{¶ 30}** Ohio caselaw consistently reflects that courts permit leading questions in cases such as this one, particularly in cases involving sexual offenses against minors. *State v. Rector*, 7th Dist. No. 01 AP 758, 2002-Ohio-7442, ¶ 30. *See State v. Miller*, 44 Ohio App.3d 42, 541 N.E.2d 105 (6th Dist.1988); *State v. Madden*, 15 Ohio App.3d 130, 472 N.E.2d 1126 (12th Dist.1984); *State v. Matheny*, 5th Dist. Tuscarawas No. 2001AP070069, 2002 WL 386163 (Mar. 6, 2002); *State v. Mader*, 8th Dist. Cuyahoga No. 78200, 2001 WL 1002365 (Aug. 30, 2001*); State v. Pegram*, 7th Dist. Mahoning No. 95 C.A. 80, 1998 WL 30141 (Jan. 22, 1998); *State v. Hutton*, 7th Dist. Belmont No. 93-B-2, 1995 WL 516962 (Aug. 30, 1995).

**{¶ 31}** We cannot find the trial court's decision to permit leading questions of the victim under the facts and circumstances of this case to be unreasonable, arbitrary or unconscionable. Wherefore, we find appellant's first assignment of error not well-taken.

**{¶ 32}** In the second assignment of error, appellant contends that the trial court erred in admitting certain photos of the victim's physical injuries at trial. Pursuant to Evid.R. 403 and 611(A), the admission of photographs lies within the sound discretion of the trial court. *State v. Williams*, 74 Ohio St.3d 569, 574, 660 N.E.2d 724 (1996).

**{¶ 33}** Photographs depicting the nature and severity of injuries are probative of the offender's intent. *Id.* at 575. Several of the disputed photographs are close-ups of other photographs. Close-ups were necessary to enable the viewer to be able to see the injuries to the hymen, posterior fourchette and source of the bleeding in the vulva area. The injuries that were visible only in the close-ups included swelling, redness and acute

10.

bruising. A different view or close-up of an injury may be introduced, which cannot be seen in other photographs, to depict a different aspect of the victim's injuries. *See State v. Tibbetts*, 92 Ohio St.3d 146, 157, 749 N.E.2d 226 (2001).

{¶ 34} The record reflects the disputed photos were necessary to accurately reflect the nature and extent of the victim's injuries which could not be fully seen or appreciated in the other photos presented. As such, they were permissible. Wherefore, we find appellant's second assignment of error not well-taken.

{¶ 35} In the third assignment of error, appellant contends that appellee failed to provide legally sufficient evidence to sustain a conviction on three counts of rape. Crim.R. 29(A) requires a trial court to order an acquittal "if the evidence is insufficient to sustain a conviction of such offense or offenses." However, if the record demonstrates that reasonable minds may reach differing conclusions as to the proof of the material elements of a crime, a trial court may not grant a Crim.R. 29(A) motion for acquittal. *State v. Bridgeman*, 55 Ohio St.2d 261, 263, 381 N.E.2d 184 (1978).

{¶ 36} The record unequivocally reflects that appellant's convictions of three counts of rape and one count of kidnapping were based upon far more than sufficient evidence. The record encompasses ample evidence of appellant's guilt, including multiple DNA matches and extensive expert testimony, all of which was corroborated by the testimony of the investigating officers and the victim. Appellant's claims suggesting that the victim was somehow the instigator and a willing participant in these events are unsupported, unilateral, and absolutely belie the record of evidence.

11.

{¶ 37} The record in this case demonstrates that a developmentally delayed girl was walking near her home when appellant forced her into a car, transported her to his apartment, and brutally raped her. The record contains overwhelming evidence of her severe injuries and a multitude of DNA matches to appellant, verifying his infliction of those injuries.

{¶ 38} Wherefore, we find appellant's third assignment of error not well-taken.

{¶ 39} In the fourth assignment of error, appellant states the convictions fell against the manifest weight of evidence. A manifest weight challenge questions whether the state has met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In making this determination, the appellate court sits as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*. at 386. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 40} We have carefully reviewed the record in its entirety. Our review of the record reveals no evidence that the fact-finder lost its way or created a manifest miscarriage of justice. On the contrary, the record reflects ample objective evidence of appellant's guilt ranging from multiple DNA matches to appellant of the semen and

12.

saliva recovered from the victim, photographic evidence of the severe physical injuries inflicted upon her during the rape, police testimony, expert medical witness testimony, and victim testimony, all consistently demonstrating appellant's guilt of kidnapping and rape.

{¶ 41} Wherefore, we find appellant's fourth assignment of error not well-taken.

{¶ 42} Based upon the foregoing, we find that substantial justice has been done in this matter. The judgment of the Lucas County Court of Common Pleas is hereby affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.

_____
JUDGE

Thomas J. Osowik, J.

Stephen A. Yarbrough, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.